TRACY L. WILKISON
Acting United States Attorney
SCOTT M. GARRINGER
Assistant United States Attorney
Chief, Criminal Division
JULIA S. CHOE (Cal. Bar No. 287038)
FRANCES S. LEWIS (Cal. Bar No. 291055)
Assistant United States Attorneys
Deputy Chiefs, General Crimes Section
     1200 United States Courthouse
     312 North Spring Street
     Los Angeles, California 90012
     Telephone: (213) 894-6530/4850
     Facsimile: (213) 894-0141
     E-mail:  julia.choe@usdoj.gov
              frances.lewis@usdoj.gov

Attorneys for Plaintiff
UNITED STATES OF AMERICA

UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

| UNITED STATES OF AMERICA, | No. CR 2:20-396-FMO-2 |
|---|---|
| Plaintiff, | GOVERNMENT'S SENTENCING POSITION |
| v. |  |
| ANTHONY VALLADARES, | Hearing Date:  October 29, 2021<br>Hearing Time:            3:00 p.m. |
| Defendant. |  |

Plaintiff United States of America, by and through its counsel of record, the Acting United States Attorney for the Central District of California and Assistant United States Attorneys Julia Choe and Frances S. Lewis, hereby files its Sentencing Position.

This Sentencing Position is based upon the attached memorandum of points and authorities, the attached exhibits, the files and records in this case, the original and revised Presentence

//

//

//

Investigation Reports, the original and revised sentence recommendation letters, and such further evidence and argument as the Court may wish to consider at the time of sentencing.

Pursuant to 18 U.S.C. § 3771(a)(3), (4), and (7) the government notifies the Court that crime victims, namely, the family of victim R.L., have been invited to exercise their right to address the Court at this sentencing hearing.

Dated: _October 12, 2021        Respectfully submitted,

TRACY L. WILKISON
Acting United States Attorney

SCOTT M. GARRINGER
Assistant United States Attorney
Chief, Criminal Division


__*/s/*_____
JULIA S. CHOE
FRANCES S. LEWIS
Assistant United States Attorneys

Attorneys for Plaintiff
UNITED STATES OF AMERICA

**MEMORANDUM OF POINTS AND AUTHORITIES**

**I.   INTRODUCTION**

In the months leading up to July 2018, defendant Anthony Valladares ("defendant") and his co-conspirators planned to forcibly kidnap victim R.L. in order to extract a ransom from him.  Defendant obtained a gun and ammunition to use during the kidnapping; he also helped one of his co-conspirators acquire a taser.  On the day of the kidnapping, defendant hid in the backseat of a minivan; then, once the victim was in the car, defendant subdued him violently with the taser.  Victim R.L. was then transported to a different location for a $2 million ransom demand.  He later died while restrained by defendant's co-conspirators, with his remains buried in a remote part of the Mojave area desert not to be discovered by law enforcement until a year after his violent death.

On October 29, 2020, defendant pleaded guilty pursuant to a written plea agreement to the single-count First Superseding Information, charging him with Conspiracy to Kidnap, in violation of 18 U.S.C. § 1201(c).  (Dkt. 72.)  The Amended Presentence Report ("PSR")[1] calculated defendant's total offense level to be 40 and, when coupled with defendant's criminal history category of I, the resulting Guideline range to be 292 to 365 months' imprisonment.  (PSR ¶ 97.)  The Probation Office also recommended a variance and a below-Guidelines sentence of 240 months' imprisonment, along with restitution of $33,090, a five-year term of supervised release, and a special assessment of $100.  (Dkt. 92 (PSR Rec.).)

---

[1] All references to "PSR" refer to the Amended Presentence Report, as filed on October 7, 2021.  (Dkt. 93.)

The government agrees with the PSR's calculations but disagrees with the application of a variance in this case. Accordingly, consistent with its commitment in the plea agreement to not seek a sentence exceeding 25 years' imprisonment, the government requests a within-Guidelines sentence of 300 months' (25 years') imprisonment, restitution in the amount of $33,090, a five-year term of supervised release, and a special assessment of $100. The government believes this within-Guidelines range accurately captures the severity of defendant's crime.

## II.  STATEMENT OF FACTS

### A.  The Preparation for the Kidnapping

In 2018, defendant began conspiring with two co-conspirators, Guangyao Yang ("Yang"), Peicheng Shen ("Shen"), to kidnap victim R.L. to make a money demand. (Dkt. 61 (Plea Agreement) at ¶ 12.)[2] On April 11, 2018, defendant and Yang conducted surveillance at R.L.'s residence to prepare for the kidnapping; Shen then arranged to meet with R.L. under the false pretense of helping R.L. collect a debt from another individual. (Id.)

On July 14, 2018, Shen, Yang, and defendant gathered near defendant's own house in Pasadena, California to attempt to kidnap R.L. (Id.) Defendant and Yang waited separately while Shen, using a pseudonym, met with R.L. (Id.) The three aborted that attempt when R.L. arrived with an additional person to meet Shen. (Id.)

---

[2] Co-conspirators Yang and Shen are currently in custody of China; they have been separately charged in United States v. Yang, et al., 2:19-cr-00107-SVW. In a statement made to Chinese law enforcement, Shen admitted that defendant had assisted with a prior kidnapping attempt on a different victim. (PSR ¶ 40.)

In preparation for the kidnapping, defendant acquired a revolver and bullets, which he possessed during the eventual kidnapping. (Id.; PSR ¶ 13.)  He also helped Yang acquire a taser to use the kidnapping.  (Plea Agreement ¶ 12.)  Further, defendant recruited co-conspirator (and co-defendant) Alexis Ivan Romero Velez ("Romero") to drive a car for use during the kidnapping and offered Romero at least $600 to drive the car during the kidnapping.  (Id.; PSR ¶ 13.) Defendant himself also expected to receive a payment of $1,000 for his role in the kidnapping from Shen and Yang.  (Plea Agreement ¶ 12; PSR ¶ 13.)

**B.   The Kidnapping**

On July 16, 2018, Shen, Yang, Romero, and defendant, using their cell phones to coordinate, met in the parking lot of a UFC Gym in Rosemead, California, to prepare for the kidnapping.  (Plea Agreement ¶ 12.)  Defendant possessed the revolver he had acquired for use during the kidnapping.  (Id.)  Romero, Shen, and defendant then drove together in a Toyota Sienna minivan from the UFC Gym parking lot in Rosemead, California, to a shopping mall in San Gabriel, California, so that Shen could meet with R.L. under the false pretense of helping R.L. collect a debt from another individual.  (Id.)  Yang drove a different vehicle to the same shopping mall in San Gabriel, California, where he waited near the minivan with Shen, Romero, and defendant.  (Id.)

Prior to the kidnapping, Shen, Yang, and defendant discussed their plans to kidnap R.L.  (Id.)  Specifically, they agreed that Shen would use a specific word to signal to defendant when it was time to appear and assault R.L.  (Id.)  Shen then left the minivan

and met with victim R.L., while defendant hid in the back seat of the minivan.  (Id.)

R.L. then entered the minivan and spoke with Shen in Chinese. (Id.)  When Shen used a specific word to signal to defendant, defendant appeared from the back seat. (Id.)  Defendant and Shen then began to violently assault R.L., including using a taser to subdue him.  (Id.)  Defendant and Shen restrained R.L. with a black hood and ties.  (Id.)  As R.L. was being restrained and subdued, Romero drove the Toyota Sienna minivan containing R.L., Shen, and defendant back to the UFC Gym in Rosemead, California.  (Id.)  At the UFC Gym, defendant and Romero left the minivan while R.L. remained bound inside the minivan.  (Id.)

Shen and Yang then moved R.L. to a different car, before driving R.L. to a separate location for the purpose of making a ransom demand from R.L.'s family, which was in fact made.  (Id.)  Specifically, on July 17, 2018, R.L.'s family received two photographs of R.L. with his legs bound, hands restrained behind his back, and his eyes taped. (PSR ¶ 18.)  On that day, R.L.'s father received an incoming call from R.L.'s WeChat (a messaging application) username.  (Dkt. 1 ("Complaint") ¶ 27.)  When R.L.'s father answered, he heard R.L.'s voice saying words (in Mandarin) to the effect of, "Father save me, help me, I have been kidnapped."  (Id. ¶ 28.)  According to R.L.'s father, an unknown male voice then came on the line and made statements, in Mandarin, to the effect of, "Your son has made me very poor. I have lost everything and suffered a divorce because of him. I have been looking for [R.L.] for a long time. You must pay two million US dollars in exchange for his life." (Id.)  R.L.'s father could hear the sounds of R.L. screaming and crying in the background;

4

he believed that he also heard R.L. being beaten.  (Id.)  Later on July 17, 2018, R.L.'s father received a photograph from R.L.'s WeChat account with three account numbers for banks in China, followed by four WeChat messages (in Chinese) from the same username with instructions on depositing a $2 million ransom into those accounts.  (Id. ¶ 29; PSR ¶ 18.)  The fourth and final WeChat message reiterated the message (in Chinese), "Three Hours."  (Complaint ¶ 29.)

### C. R.L.'s Death

Although defendant was not present for R.L.'s death, R.L. subsequently died while still in the custody of Shen and Yang.  (Plea Agreement ¶ 12.)  In an interview with Chinese law enforcement, Shen stated that defendant had tased R.L.'s face, neck, and chest to subdue him in the minivan and wrapped R.L.'s eyes and mouth with black packaging tape.  (Complaint ¶ 58.m.)  Shen also admitted that he had kicked R.L. and sealed his mouth with packaging tape at the house where they took R.L. following the kidnapping.  (Complaint ¶ 58.m.)  Later, Shen and Yang found that R.L. was not breathing and had died.  (Id. ¶ 58.n.)  Shen then put the packaging tape, ties, gun, and Taser used in the kidnapping into a plastic bag, and drove with Yang to a deserted area outside of Los Angeles to bury R.L.'s body.  (Id.)

Shen further stated that after the kidnapping, defendant came to Shen and asked for his money for the kidnapping.  (Id. ¶ 58.p.)  When Shen stated that Yang would pay him later, defendant threatened to report Shen to the police if he were not paid.  (Id.)

R.L.'s remains were eventually recovered from the Mojave area desert and confirmed to be his via DNA testing on July 26, 2019.  (PSR ¶ 10.)

**D. Valladares Speaks to the FBI and Makes Statements Inconsistent with Location Data**

During the year-long search for R.L., the Los Angeles Sheriff's Department publicized fliers seeking information about the case that contained a sketch artist drawing of one of the co-conspirators (Shen). On October 24 and 25, 2018, defendant reached out to the FBI and informed agents that he knew the person depicted on the flyer as "Damon Cheng," a person he had met in 2016 at the UFC Gym. (Complaint ¶ 35.) Defendant also stated that he had met with this person several times at his house, and that a second person named "Howsang" (who the FBI later identified as Yang) sometimes attended the meetings. (Id.¶¶ 36-37.) However, defendant claimed that he had deleted text messages and call history between himself and "Damon Cheng" (Shen), and that the last time that Shen had come to his house was in early July 2018. (Id. ¶¶ 41-42.)

These statements directly contradicted location data obtained by the FBI, showing that defendant and Shen's phones pinged off of cell towers near defendant's house on July 14, 2018 (on the day of the attempted kidnapping of R.L.).

**III. THE GUIDELINES CALCULATION**

The PSR calculated the offense level as follows: a base offense level of 43 (USSG §§ 2X1.1(a), 2A4.1, and 2A1.1 (First Degree Murder controls if victim was killed under circumstances that would constitute murder under 18 U.S.C. § 1111, which includes the felony murder rule)), and a 3-level decrease for acceptance of responsibility (USSG §3E1.1(a), (b)), resulting in a total offense level of 40. (PSR ¶¶ 28-39.) See also U.S. v. Chang, 59 F. App'x 361 (2nd Cir. 2003) (unpublished) (affirming application of USSG

6

§ 2A1.1 for a kidnapping resulting in death even where defendant did not participate in the actual killing).

The PSR also determined that defendant's criminal history category is I. (PSR ¶ 46.)[3] The resulting Guidelines range would be 292 to 365 months. (PSR ¶ 97.) The government agrees with the PSR's sentencing calculations.

Pursuant to the plea agreement, the parties have agreed that a custodial sentence between 12 and 25 years represents a reasonable and appropriate sentence in this case, and have agreed to argue for a sentence within this range. (Plea Agreement ¶ 15.) The government has also reserved the right to argue that aggravating factors warrant a sentence at the high end of this range, e.g., 25 years. (Id.)

**IV. GOVERNMENT'S SENTENCING RECOMMENDATION**

In accordance with the § 3553(a) factors and the foregoing, the government recommends that the Court impose the following sentence: (a) a custodial sentence of 300 months' (or 25 years') imprisonment, (b) five years of supervised release; (c) restitution of $33,090; and (d) a special assessment of $100. Although there are mitigating factors in this case, including defendant's lack of adult criminal history, the government highlights aggravating factors below to emphasize that a high-end Guidelines sentence is warranted, rather than the below-Guidelines sentence recommended by Probation. As noted below, the weight of the § 3553(a) factors -- the nature and circumstances of the offense; the seriousness of the offense; the need for just punishment; the need for adequate deterrence; and the

---

[3] Defendant has a juvenile conviction for making a bomb threat to a school, for which he was sentenced to home on probation and a juvenile court work program. (PSR ¶ 44.)

7

need to protect the community – compel a significant custodial sentence.

### A. The Nature, Circumstances, and Seriousness of the Offense, and the Need to Provide Just Punishment, Warrant a Meaningful Custodial Sentence and Fine

The seriousness of defendant's crime cannot be overstated. Defendant was an active participant and organizer of a violent kidnapping motivated solely by greed. He acted with utter disregard to the potential suffering and harm to the victim and his family. Indeed, the victim of the crime, who himself was targeted merely because of his family's money, died while being held in captivity by defendant's co-conspirators.

The statements of victim R.L.'s parents underscore the magnitude of defendant's crime, and the extreme pain that the family has been undergoing since the kidnapping and R.L.'s death. R.L.'s family has been in anguish from the very beginning of this crime; they are, in many ways, direct victims of the kidnapping and ransom. R.L.'s father was the one who received the $2 million ransom demand from defendant's co-conspirators and who heard his son being beaten. After being unable to secure the ransom within the three-hour time limit, the family heard nothing from their son. For almost a year following the kidnapping, R.L.'s parents did not have closure of knowing what had happened to him or where he was buried. Indeed, following their son's disappearance, victim R.L.'s parents, who live in China, spent months in the United States looking for their son-- those costs underlie the agreed-upon restitution award in this case. (See Plea Agreement ¶ 7; PSR ¶ 22.)

R.L.'s family remembers him as being "sunny, kind, honest and striving for success." (See Victim Impact Statement (concurrently

filed).) Now, because R.L. was the family's only son, losing R.L. in the parents' old age has left them "old and helpless," and crying as they wrote out the statements they have provided to the Court. (Id.; PSR ¶ 21.) R.L.'s parents have asked that this Court give defendant the severest punishment to "comfort R.L.'s soul in heaven" and to give the family a sense of justice. (PSR ¶ 21.) The parents also noted the trauma of the experience, which is painfully evident from their statements. (Id.)

Moreover, although there were multiple conspirators involved in conducting this serious offense, defendant was not an ancillary participant. Rather, defendant was actively involved right from the beginning. Three months before the kidnapping, defendant met with the other co-conspirators and conducted surveillance of R.L.'s residence. He then met with the other co-conspirators at defendant's own house in order to attempt to kidnap R.L.; that attempt was only aborted when R.L. arrived with a different person. Indeed, defendant even recruited co-defendant Romero to join the conspiracy and drive one of the cars used in the kidnapping. The length of defendant's participation in the conspiracy and his multiple acts in furtherance of it show that this offense was not a one-time mistake made by a desperate man. Instead, this offense was a concerted, months-long effort on the part of defendant and his co-conspirators to kidnap R.L. for ransom. (And as noted in the PSR, defendant participated in a separate attempted kidnapping with co-conspirator Yang prior to this one. (PSR ¶ 40.) Further, after the kidnapping and R.L.'s death, defendant audaciously came back to one of the co-conspirators and asked to be paid; when he was not, he even went to the FBI and, rather than provide helpful information about the case or what

9

happened to R.L., he lied to agents about his last contacts with Shen and failed to provide accurate information about his co-conspirators' identities. Defendant's deliberate effort to conduct a serious and violent crime, and then to purposefully obscure it from authorities, justifies the serious custodial sentence that the government requests.

On a final note, it is beyond dispute that defendant fully contemplated and participated in the brutal nature of the kidnapping. Though defendant was not present at R.L.'s death, defendant's actions showed that he anticipated it and that R.L.'s death was reasonably foreseeable. Defendant himself purchased a revolver and bullets for the kidnapping, which he possessed during the kidnapping. He also helped a co-conspirator purchase a taser, which defendant himself used on R.L. to violently subdue him at the initial seizure in the minivan. Although R.L. survived that initial attack and died at a different location, it was defendant's actions that led to that terrible outcome. Defendant's sentence should reflect those acts.

The government does not emphasize this conduct to advocate for anything above a 300-month sentence, but rather to rebut arguments that a variance, or a significantly below-Guidelines sentence, is justified here. Defendant is not a youthful offender who made a momentary mistake with tragic consequences. Instead, he is an adult who chose to engage in concerted, on-going criminal conduct. Therefore, a significant sentence of 300 months is amply warranted.

### B. General and Specific Deterrence and the Need to Promote Respect for the Law Also Compel a Meaningful Custodial Sentence

This case arose from a well-planned effort to kidnap and hold a foreign national victim for ransom. Defendant had every opportunity

10

to withdraw from this conspiracy in the many months leading up to the kidnapping. Instead, defendant chose not only to buy weapons for the kidnapping, but also to hire co-defendant Romero to be the driver for the crime. A substantial sentence is therefore warranted in order to ensure that defendant, and others will not be emboldened to commit similar crimes. The sentence in this case must be severe enough to deter defendant and others from weighing the costs of a lenient sentence against the potential gain of a ransom to themselves.

**C.   The History and Characteristics of Defendant Also Support the Government's Recommended Sentence and Do Not Justify a Variance**

Defendant's own history and characteristics include some mitigating circumstances. However, on balance, there is no basis in this case for the variance recommended by U.S. Probation. The main basis for the proposed variance is defendant's family life. (PSR Rec. at 5.) As the PSR notes, defendant was raised by his father and step-mother in a harsh household that used physical punishment. (PSR ¶¶ 55-56.) As further mitigation, defendant has no prior criminal history. Upon arrest, he fully confessed, waived his right to an indictment, pleaded guilty, and has now accepted responsibility for his actions.

The government recognizes these mitigating facts. However, although defendant's life certainly has not been ideal, those circumstances simply do not excuse the criminal acts at issue here. Instead, given the severity and magnitude of the crime here, those factors support a within-Guidelines sentence, not a below-Guidelines one. Further, defendant's employment history suggests that defendant

11

could well have found other ways to support himself, rather than engaging in a kidnapping for ransom.  (See PSR ¶¶ 78-84.)

**V.    CONCLUSION**

For the foregoing reasons, the government respectfully requests that the Court impose a sentence of 300 months' imprisonment, restitution in the amount of $33,090, a five-year term of supervised release, and a special assessment of $100.